# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRIS LAMB, | 1:07-cv-00317 OWW DLB HC |
|         Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
|    v. | [Doc. 1] |
| JAMES YATES, Warden, | |
|         Respondent. | |
| _____/ | |

Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.   Petitioner is represented by Eric S. Multhaup, Esq.

RELEVANT HISTORY

Following a jury trial in the California Superior Court for the County of Merced, Petitioner was convicted of five counts of forcible lewd or lascivious act upon a child under the age of 14 (Cal Penal Code[1] § 288(b)(1) [counts 1-4, 6]), one count of attempted forcible lewd or lascivious act upon a child under the age of 14 (§§ 664/288(b) [count 7]), two counts of lewd or lascivious act upon a child under the age of 14 (§ 288(a) [counts 10 and 11]), and one count of continuous sexual abuse of a child under the age of 14 (§ 288.5 [count 9]).   The jury also found true with respect to counts 1-4, 6, 7, 10, and 11, that Petitioner committed the offenses against more than one victim (§ 667.61(e)(5)).   (Lodged Doc. No. 1.)

On February 13, 2004, Petitioner was sentenced to an aggregate term of 107 years to life

---

[1] All further statutory references are to the California Penal Code unless otherwise indicated.

computed as follows: aggravated term of 16 years on the continuous sexual abuse count (§ 288.5(a)), plus one year (one-half of one-third of the midterm of three years) on the attempted forcible lewd act count (§§ 664/288(a)), plus six consecutive 15-year-to-life terms on the forcible lewd act counts (§288(b)) pursuant to section 667.61(b) and (e)(5).  (Id.)

Petitioner filed a timely notice of appeal.  On September 16, 2005, the California Court of Appeal, Fifth Appellate District affirmed the judgment.  (Id.)  On November 30, 2005, the California Supreme Court denied review.  (Lodged Doc. Nos. 2 and 3.)

On February 27, 2007, Petitioner filed the instant federal petition for writ of habeas corpus, and requested the Court stay the petition pending exhaustion of the unexhausted claims in the state court.  (Court Doc. 1.)  On May 8, 2007, the Court granted Petitioner's request to stay and hold the petition in abeyance.  (Court Doc. 4.)

On February 28, 2007, Petitioner filed a petition for writ of habeas corpus in the California Superior Court, which was denied on November 5, 2007.  (Lodged Doc. Nos. 4 and 5.)

On January 3, 2008, Petitioner filed a petition for writ of habeas corpus in the California Court of Appeal, Fifth Appellate District.  (Lodged Doc. No. 6.)  The petition was summarily denied on February 8, 2008.  (Lodged Doc. No. 7.)

On April 30, 2008, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court, which was summarily denied on December 10, 2008.  (Lodged Doc. Nos. 8 and 9.)

On May 8, 2009, Respondent filed an answer to the petition.  (Court Doc. 26.)  After receiving two extensions of time, Petitioner filed a traverse on August 18, 2009.  (Court Doc. 35.)

///

///

///

///

<u>STATEMENT OF FACTS</u>[2]

# I

## PROSECUTION CASE

Appellant's daughter, M.L., was 12 years old at the time of trial. Appellant molested her a couple of times a month from the time she was six or seven until her 12th birthday. Acts included mutual fondling, attempted intercourse, attempted sodomy, and oral copulation. Appellant would tell M.L. to do what he wanted or she would get in trouble. If she said no to oral copulation, he would push her head down.

Sometimes, appellant would tell M.L. and her sister, H.L., to invite their friend, R.R., to spend the night. On one occasion when R.R. was present, appellant made all three girls fondle and orally copulate him. At the time, appellant had taken sleeping pills and consumed a couple of beers. M.L. described him as being "sort of sleepy but he was sort of awake" and "kind of drunk." Appellant also rented some pornographic videos on that occasion and had the girls watch with him.

M.L. initially did not report the abuse because she was afraid. Appellant had told her that if she ever told, he would take away everything she and her mother had, and she would never again be able to see her mother.[3FN2] In addition, if appellant grew angry over something, he would grab M.L.'s hair and pull her by it, and curse at her and call her names. Sometimes he would spank her with his hand or a paddle. Occasionally, this caused bruises. He would do the same to H.L. Once, when H.L. tried to stop appellant from hitting M.L., appellant threw M.L. to the ground, then struck H.L., backing her into the wall and causing her head to bleed. At the slumber party for her 12th birthday, however, M.L. told her friends, V.M. and A.M. After M.L.'s mother was told, the police were notified.

Appellant's daughter, H.L., was 15 years old at the time of trial. On one occasion, R.R. spent the night. M.L. was also present. H.L. and R.R. were running around while appellant chased them. H.L. tripped and grabbed his sweatpants, and accidentally pulled them down as she fell. She could not recall whether appellant attempted to pull his pants back up, but he was not wearing underwear. All three girls had to fondle appellant, and H.L. and R.R. had to orally copulate him.[4] There was pornographic material on television while the molestations were occurring. H.L. believed R.R. was the one who put the video in the machine, although possibly at appellant's direction. Appellant also made them watch it afterward, but then he fell asleep and they turned it off. Appellant was somewhat half-asleep while

---

[2] The Court finds the Court of Appeal correctly summarized the facts in its September 16, 2005 opinion. Thus, the Court adopts the factual recitations set forth by the California Court of Appeal, Fifth Appellate District. (Lodged Doc. No. 1.)

[3] M.L.'s mother did not live in the home during the time the molestations occurred.

[4] H.L. did not remember what appellant did to make her do this, but he told her that she had to. At trial, she denied that R.R. was the person who made her do it; however, at the preliminary hearing, she testified that it was not really appellant who made her do it, but instead it was R.R. who was pressuring her. In her initial interview with the police, she denied orally copulating or fondling appellant.

the molestations were occurring, having ingested sleeping pills and beer when he came home that evening. The next day, appellant asked H.L. why the pornographic tape was out, and she told him they were watching it. He told her not to tell anybody what had happened that night.

Appellant whipped H.L. with his hand, a paddle, or a wooden spoon on numerous occasions, sometimes leaving bruises. He would often move her around by pulling her hair. He would also call her his "prison bitch." H.L. did not report the molestations until after M.L. told, because she did not know if the conduct was right or wrong, and appellant said that if she told, she would never see him again. He also threatened to take away all of her belongings and send her off to boot camp.

R.R. was 15 years old at the time of trial. When she was 10, her mother was appellant's girlfriend; as a result, R.R. spent nearly ever weekend for almost a year at appellant's house. During this time, appellant molested her "[a]ll the time." H.L. and M.L. would be elsewhere in the house. Appellant would fondle her and she would push his hand away, but he would not let her go.

On one occasion, H.L. and M.L. were present. Appellant put on a pornographic videotape and told the girls to watch it. He was drinking. The girls had soft drinks, and R.R.'s tasted like it contained beer. She refused to drink it. At some point, appellant pulled off his pants, then fondled H.L. and M.L. and made them orally copulate him. He also fondled R.R. and made her sit on him so that his penis entered her vagina.[5] He was awake while all this was going on, and threatened to hit the girls if they did not comply. Although he previously had not struck R.R., he would yank her hair a lot. She had also seen him spank H.L. and M.L. and pull their hair. After this molestation, the three girls took a bath together as they usually did. This time, appellant got into the tub with them. He was awake. The next day, he took R.R. home and asked what they had done to him.

R.R. reported the abuse to her mother shortly after, but the police were not notified until much later. Because she was embarrassed, R.R. lied to the police about what happened during the initial interview.

C.S. was 14 years old at the time of trial. When she was around five or six years old, she sometimes played at appellant's house with M.L. and H.L. During those times, appellant molested her on two occasions. On one occasion, there was a pornographic video on television and appellant put his penis against C.S.'s rear end. On the other occasion, appellant showed his penis to C.S. and then licked her vagina, possibly through her underwear. C.S. subsequently reported the abuse to her mother, but nothing happened.[6] She then reported it to her next door neighbor, at which point the police became involved. Merced Police Detective Rentfrow concluded at the time that the charges were unfounded, because he was unable to locate any other witnesses or victims, or anything to corroborate C.S.'s claims. During his interview with C.S., she appeared to be very carefree. In addition, when

---

[5] R.R. denied that it was her idea that night for everyone to have sex with appellant, or that she tried to talk everyone into doing it or pressured H.L.

[6] C.S.'s mother was afraid of what appellant might do. He once told her that if she ruined his life, he would ruin hers.

he interviewed H.L. and M.L., both said they were happy living with appellant, and both said C.S. lied a lot.

B.D., appellant's stepdaughter and the half-sister of H.L. and M.L., was an adult as of the time of trial. She lived with, or had contact with, appellant from age 6 until age 15. From the time she was 8 until the time she was 15, appellant made her masturbate him on numerous occasions. He would grab her arm if she tried to get away. B.D. initially did not report the abuse because her parents were engaged in a custody dispute, and appellant told her that she would not get to see her mother or sisters again. She came forward when she was informed that something similar had happened to M.L.

Dr. Urquiza, a psychologist who was a faculty member in the Department of Pediatrics at the University of California Davis Medical Center and who specialized in child abuse, testified concerning the Child Sexual Abuse Accommodation Syndrome (CSAAS). Urquiza explained that CSAAS is not used to determine whether a specific person has been sexually abused, but instead to dispel myths or misperceptions concerning sexual abuse and to provide an understanding about what commonly occurs with a child who has been sexually abused. The first component of CSAAS is secrecy. It is a myth that a child will immediately report being sexually abused. The second component is helplessness. It is a misperception that children can ensure their own sexual safety. The third component involves entrapment and accommodation, i.e., the strategies children use to cope with the situation. It is a myth that a child who is abused will be very tearful and upset. Instead, such children often suppress their feelings. The fourth component involves delayed and unconvincing disclosure. The misperception is that an abuse victim will tell someone. Instead, it is common for a child to have a delay-often, a significant delay-between the start of the abuse and the time of disclosure. There is also a misperception that the child victim will be able easily to articulate, describe, and report what happened. Instead, disclosure is a process during which the child may make inconsistent statements, provide additional information as time passes, or appear unconvincing about, or detached from, the events being recounted. The fifth component is retraction. It is a misperception that victims always hate their perpetrators. Instead, especially if the victim has a long-term relationship with the perpetrator, the child is able to separate the experience of being abused from the relationship he or she has with someone about whom he or she cares; hence, the child may be ambivalent about disclosing or sustaining the disclosure.

## II

## DEFENSE CASE

Pursuant to a physician's prescription, appellant was taking Ambien for insomnia related to depression. The prescribing physician did not believe the dosage-10 milligrams-was high enough to cause appellant to become unconscious. However, Dr. Victor, a psychiatrist who had done work in the field of psychopharmacology, felt that side effects-including memory loss-were more likely to occur at that dosage than at the lower available dosage. Two 10-milligram pills followed by two beers definitely would be unadvisable: both alcohol and Ambien may have the effect of lowering a person's inhibitions; 20 milligrams of Ambien has been reported to put one in a dissociative state without alcohol; some of Ambien's side effects are worsened by alcohol; and alcohol would increase the chance of inducing a dissociative state.

A dissociative state signifies a state of mind that is separate from one's ordinary waking state of mind. Someone in a dissociative state lacks judgment and control, and the hallmark of such a state is lack of memory and no access to the person's control systems. It is a form of unconsciousness, despite the fact the person's eyes may be open and he or she may speak, because one does not have access to one's usual state of mind or judgment, i.e., one's usual ability to analyze the meaning and consequences of one's actions.

Fifteen-year-old Nikki S. was acquainted with R.R., who was very untruthful most of the time and also used a lot of bad language. In addition, R.R. commonly stole from Nikki. Nikki's father confirmed that R.R. frequently used sexualized words. R.R.'s father confirmed that R.R. told "quite a bit of stories."

Sheri Flores provided daycare for M.L. and H.L. for approximately four years. At no time did she see appellant abuse his daughters. Approximately three months before trial, H.L. came to visit Flores. H.L. related that nothing had happened to her, although appellant did things to M.L.

Dr. Meister, a psychologist in private practice and administrative research director at Hoffman Institute, testified concerning CSAAS. He explained that CSAAS is considered a confirmatory bias model. Such models are dangerous because they basically advocate one position. A confirmatory model such as CSAAS confirms one side and does not look at the alterative on the other side.

According to Meister, CSAAS has "[b]y and large" been rejected by the scientific community, on the basis of its inability to discriminate between true and false allegations. It does not follow the criteria that would be required for it to be a testing device, and has been rejected by a number of authors as not being able to identify which children might have been molested and which children have not. CSAAS was never designed or intended for use as a forensic tool.

Appellant testified on his own behalf. A truck driver with fluctuating hours, he came home one day to find that his wife had left him and his daughters. The girls, who were three and five years old at the time, were devastated. Appellant admitted spanking the children on occasion, but denied leaving bruises or being physically abusive. He sometimes pulled their hair to separate them when they fought.

C.S. and her mother were appellant's neighbors. C.S. frequently was left unattended during the day, and sometimes overnight. C.S. would come to appellant's house seeking food, and he would feed her and, if necessary, give her a place to spend the night. Appellant and C.S.'s mother had a sexual relationship on one occasion; C.S. walked in on them while they were having oral sex, and became upset and ran out of the room. Appellant loaned money to C.S.'s mother at the mother's request; it was never repaid, and eventually he started turning down her requests for money. She threatened to turn him in to the police for molesting her child if he did not give her money. He gave her money on two more occasions, then stopped. He denied ever molesting C.S.

Appellant began taking Ambien in 1996 or 1997. On one occasion, he came home from work following a 13-hour shift. He was very tired and had to be up in the morning, so he rented some videos and got some pizza for the girls, then took 20 milligrams of Ambien. He also had two beers. He then went to sleep on the couch. When he awoke, he was on the floor in the living room and a pornographic video was playing. He awakened the girls, then took them separately

6

to another room and interrogated them about who went through his belongings, as the adult videos were kept hidden in a drawer in his bedroom. H.L. and M.L. said that R.R. did it. Appellant then took R.R. home and told her mother she was no longer welcome at his house.[7] Appellant denied showing the videos to his children, or having any sexual contact with them or with R.R. He believed, however, that it was possible he was unconscious that night from alcohol and Ambien, and the girls molested him without his knowledge.

When appellant's ex-wife returned to Merced, appellant allowed her to stay at his residence for a couple of months. He immediately gave her visitation with the girls. At some point after she remarried, however, he refused to allow the girls to go to her house because her husband was physically abusing them. This occurred shortly before the birthday party at which M.L. made the molestation allegations. Appellant was arrested, but released a few days later without charges. After, his ex-wife brought the girls by to visit on many occasions, and he and H.L. began exchanging e-mails. On one occasion, H.L. related that her mother had said that if H.L. changed her story, she was going to go to juvenile hall.

(Lodged Doc. No. 1, Opinion, at 3-10, 2005 WL 2248865.) (Footnotes in original.)

DISCUSSION

A.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of the Merced County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert. denied, 520 U.S. 1107, 117 S.Ct. 1114 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed

---

[7] R.R. visited with H.L. and M.L. on a regular basis prior to this time. She used awful, sexual language.

7

after the enactment of the AEDPA and is therefore governed by its provisions.

B.    Standard of Review

Where a petitioner files his federal habeas petition after the effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is "contrary to" federal law if it "applies a rule that contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from" a Supreme Court case, yet reaches a different result." Brown v. Payton, 544 U.S. 133,  141 (2005) citing Williams (Terry) v. Taylor, 529 U.S. 362, 405-06 (2000).  A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable." Id., quoting Williams, 529 U.S. at 409-10; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002) (per curiam).  "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Lockyer, at 1175 (citations omitted).  "Rather, that application must be objectively unreasonable." Id. (citations omitted).

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law. See Lambert v. Blodgett, 393 F.3d 943, 976-77 (2004).

Courts further review the last reasoned state court opinion. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991).  However, where the state court decided an issue on the merits but

8

provided no reasoned decision, courts conduct "an independent review of the record . . . to

determine whether the state court [was objectively unreasonable] in its application of controlling

federal law." Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000). "[A]lthough we

independently review the record, we still defer to the state court's ultimate decisions." *Pirtle v.*

*Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

C.     Prosecutorial Misconduct

       Petitioner contends that the prosecutor committed several instances of misconduct during

his trial in violation of his due process rights.

       1.     State Court Decision

       The California Court of Appeal reviewed each instance of alleged misconduct and found

error, if any, to be  harmless, stating in relevant part:

       Appellant moved, in limine, to exclude evidence of his character for the use
       of drugs or alcohol.  He specifically requested that any evidence concerning the
       consumption of alcoholic beverages or ingestion of narcotic substances be limited
       to the days of the alleged acts, and that prosecution witnesses be instructed not to
       volunteer information concerning appellant's drinking habits or use of narcotics.
       The prosecutor opposed the motion on the grounds that appellant's expert
       apparently was going to testify that appellant's combined use of alcohol and
       Ambien caused him to be in an unconscious, dissociative state which allowed the
       girls to molest him.  The prosecutor represented that a number of witnesses were
       prepared to testify that appellant habitually used methamphetamine, and he wanted
       to be able to ask the defense expert how that affected his opinion.  The court ruled
       admissible testimony by victims that the molestations occurred in conjunction with
       appellant's consumption of alcohol or drugs, but excluded evidence of other drug
       use subject to the prosecutor making an offer of proof at the time he wished to
       offer such evidence.  The court found that, in order for such evidence to be
       relevant, the prosecution would have to show that appellant used
       methamphetamine near in time to the event the expert was to discuss, so that its
       effects were still in appellant's system to diminish the impact of the Ambien.

       M.L. subsequently testified that, on the occasion that she, H.L., and R.R.
       had to do things with appellant, he took sleeping pills.  The prosecutor elicited that
       M.L. saw him take the pills on other occasions as well, and that she saw him take
       pills almost every day and thought the pills were Vicodin. When the prosecutor
       asked whether M.L. ever saw appellant take anything besides pills, M.L. said no.
       Outside the jury's presence, defense counsel noted that the latter question violated
       the court's order, but acknowledged that no harm was done.  The court warned
       the prosecutor that it was "borderline," but accepted his representation that it was
       unintentional.

       The prosecutor raised the issue again the next morning, arguing that
       appellant should not be permitted falsely to portray himself as a good father or the
       victims' mothers as bad mothers.  The prosecutor also represented that, when
       interviewed by the police concerning the allegations of C.S., appellant stated that

9

he never used drugs; hence, his drug use was relevant to his credibility.  The court directed defense counsel to stay away from the subject with respect to the victims' mothers; as to the prosecutor's argument, the court ruled that the probative value of the proffered evidence was substantially outweighed by its prejudicial effect, as the only probative value was to portray appellant generally as a bad person.  At defense counsel's request, the court directed the prosecutor to caution his witnesses on the subject.

During his examination of C.S.'s mother, the prosecutor asked why she did not call the police when C.S. initially reported that appellant had molested her. The prosecutor elicited that the mother was afraid of appellant, who threatened to ruin her life if she ruined his.  When the prosecutor asked how appellant could ruin her life, the witness replied that she did not know.

This ensued:

"Q. [by Mr. Sandhaus, the prosecutor] Ms. [S.], did [appellant] have any knowledge about your personal life that he thought he could use against you?

"A. No.

"Q. Did you used to go to Stockton on the weekend?

"A. Monthly, yeah.

"Q. Why would you go to Stockton?

"A. To get some crank for [appellant].

"THE COURT: Side bar.

"(Off-the-record side-bar conference.)

"THE COURT: Ladies and Gentlemen, you're to disregard the last comment.  You are to treat it as if it's never been said and you never heard it.

"MR. SANDHAUS: Q. Now, do you recall that we just went in the hallway and talked about things you could say and not say?

"A.  Yeah.

"Q.  Did we tell you not to say certain things?

"THE COURT: Mr. Sandhaus, move on to a different subject matter.

"MR. SANDHAUS: Q. Now at some point in time, Ms. [S], did you try to investigate whether your daughter had truthfully been molested or not?

"A. Yeah.

"Q. What did you do to find out whether your daughter had been molested or not?

"A. I went over to [appellant's] house about three times and talked to him.

10

"Q. What kind of things did you talk about?

"A. First time I went over there – what kind of things I talk about, that [C.S.] had been molested.

"MR. SANDHAUS: Hold it, hold it, side bar."

Outside the jury's presence, the court reminded the witness that there was not to be any mention of drug use, and that she was not to bring it up again. She explained that she had not understood what the prosecutor was asking, as her daughter's father also lived in Stockton. When defense counsel asked whether she had told anyone in the district attorney's office that she had gone to Stockton to buy drugs for appellant, she responded, "Not in the same sentence." The prosecutor represented that his office's report talked about the witness's statement that she went to Stockton to visit the father, and that there was nothing about obtaining drugs. The court warned the prosecutor that he was "not looking good," but denied the defense request for a mistrial.

Defense counsel subsequently argued that the prosecutor committed misconduct by essentially informing jurors that evidence was being kept from them. Counsel requested that the court control the prosecutor, to which the court replied: "The court will. Mr. Sandhaus, the court was particularly disturbed by the questions, form of the questions, to Mrs. [S.] about reasons for going to Stockton. There had been Motions in Limine. You had protested vehemently the court's rulings about excluding evidence of drug usage or possession. The court still feels that it's too remote in time. It's not relevant to any issues and it's clearly subject to [Evidence Code section] 352 problems and substantial prejudice. So, uhmm, the way the question was asked in just the tenor and the way it came out frankly just didn't smell right. And so I'm not saying it didn't pass the smell test, but it didn't smell right. [¶] So Mr. Sandhaus, you are warned that if you want to avoid a mistrial in this matter, to not cross those lines again." The court again accepted the prosecutor's representation that what happened was inadvertent.

. . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . .. . . . . . . . . . .

As the record does not clearly establish that the prosecutor intentionally elicited evidence concerning appellant's drug use, we accept – as did the trial court – the prosecutor's representation that what occurred was inadvertent.[8] It also appears the prosecutor warned his witnesses not to broach the subject. Once this witness blurted out the answer, however, the prosecutor should not have elicited, in front of the jury, that the witness had been told not to say certain things.

. . . Although, as we have noted, the prosecutor continued to argue for admissibility of appellant's drug use, the jury was not privy to these arguments or to further inappropriate drug references. The offending incidents involving M.L. and Ms. S. were brief and isolated; as defense counsel conceded, no harm was

_____

[8] We are not sure why the prosecutor would seek to establish that Ms. S. sometimes went to Stockton to visit C.S.'s father, although it may have been related to appellant's claim that C.S. frequently was left unattended so that it fell to him to provide her with food and lodging. In any event, we will not infer, without more, that the prosecutor intentionally sought to violate the court's ruling with respect to appellant's drug use. Although, after this incident, the prosecutor continued to try to convince the court that the evidence should be allowed, he did not again broach the subject in the jury's presence, and appears scrupulously to have tried to avoid any other prohibited reference to drugs.

11

caused by the question to M.L., and both improper references involving Ms. S. were followed immediately by a forceful admonition from the trial court.  Given the plethora of properly-admitted evidence suggesting appellant was not a nice person, we cannot conclude that isolated references to illegal drugs (assuming the jury even interpreted the question to M.L. in that manner) and a suggestion of additional evidence on this point, prejudiced appellant. [citations.][9]

(Lodged Doc. No. 1, Opinion, at 12-17.) (Footnotes in original.)

Regarding the prosecution's closing argument to the jury, the Court of Appeal held, in pertinent part, as follows:

During his summation, defense counsel played portions of various tape-recorded interviews.  In part, counsel criticized the initial investigation by then-Officer Brewer into the allegations made by M.L. and H.L.  The prosecutor responded:

You recall Mr. Clancy [defense counsel] coming out and first saying there was an amateur investigation.  The reason he said there was an amateur investigation because after Officer Nicolas Brewer made his initial investigation no detective ever showed up.

Actually, what the record shows, Ladies and Gentlemen, is that on November 20th, '03, defendant consented to a search to Detective Gorman who was then leading the investigation.  When Detective Gorman did that search Sergeant Gruden and Detective Makarian were with him.  Also the evidence shows – or actually, what I'm saying happened now at this point to rebut his statement is, Detective Gorman interviewed a witness on November 20th.  And the on [sic] March 7th, '03 Detective Gorman interviewed this defendant on tape and he played the tape for you.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

It does not appear that any tape-recorded interview of appellant was admitted into evidence or that portions thereof were played for the jury. . . . Nevertheless, the prosecutor's misstatement cannot have prejudiced appellant.  The thrust of the argument was not that a tape-recorded interview of appellant existed, but that a detective was in fact involved in the investigation.  That assertion was true, and it was appellant himself who called Detective Gorman as a witness.  Appellant complains that by his argument, the prosecutor informed jurors that there was additional evidence not presented to them at trial.  However, we find it much more likely, in light of the prosecutor's request for a sidebar conference and then his immediate shift to a discussion of the taped interview with R.R., that jurors construed the challenged remarks as a simple failure to memory.  In light of the record, we decline to infer that the jury drew the most damaging meaning from the challenged statements. [Citation.]  Moreover, even assuming jurors concluded appellant had given a tape-recorded interview which was not presented to them,

---

[9] We note that the prosecutor's reference was not the only suggestion that information existed which was not being presented to the jurors.  On at least two occasions, a witness was called to the stand in front of the jury, then asked to accompany the trial court outside the jury's presence.  The second of these was at defense counsel's request.

appellant cannot have been harmed since the prosecutor made no reference to the contents of the interview.  Jurors likely would have assumed that, had appellant made statements during the interview in which he incriminated himself or which were inconsistent with his trial testimony, the prosecutor would have presented them.

(Lodged Doc. No. 1, Opinion, at 36-38.)

    2.    Applicable Law

    A habeas petition will be granted for prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 171, 106 S.Ct. 2464 (1986) (*quoting* Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871 (1974)); see Bonin v. Calderon, 59 F.3d 815, 843 (9th Cir. 1995).  To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." Greer v. Miller, 485 U.S. 756, 765, 107 S.Ct. 3102, 3109 (1987) (*quoting* United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375 (1985)). Under this standard, a petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial - i.e., that absent the alleged impropriety, the verdict probably would have been different.  If the prosecutor committed misconduct, the court must find actual prejudice to reverse a defendant's conviction.  Brecht v. Abrahamson, 507 U.S. 619 (1993).  There can only be prejudice upon a showing that the error had a "substantial and injurious effect or influence in determining the jury's verdict.  Id. at 637 (quoting Kotteaskos v. United States, 328 U.S. 750, 776 (1946)).

    3.    Procedural Default

    Respondent initially argues the prosecutorial comments or conduct that were not contemporaneously objected to at trial were rejected by the state court of appeal on the ground of waiver and are now barred from federal habeas review.  See Rich v. Calderon, 187 F.3d 1064, 1069, 1070 (9th Cir. 1999).

        Under Section 353 of the California Evidence Code, also know as the "contemporaneous objection rule," evidence is admissible unless there is an objection, the grounds for the objection are clearly expressed, and the objection is made at the time the evidence is introduced.  California courts construe broadly the sufficiency of objections that preserve appellate review, focusing on whether the trial court had a reasonable opportunity to rule on the merits of the objection before the evidence was introduced.

13

Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002) (footnote omitted); see e.g. People v. Scott, 21 Cal.3d 284, 290 (1978) ("In a criminal case, the objection will be deemed preserved if, despite inadequate phrasing, the record shows that the court understood the issue presented.").

Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729, 111 S.Ct. 2546 (1991); LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001). If the court finds an independent and adequate state procedural ground, "federal habeas review is barred unless the prisoner can demonstrate cause for the procedural default and actual prejudice, or demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice." Noltie v. Peterson, 9 F.3d 802, 804-805 (9th Cir. 1993); Coleman, 501 U.S. at 750; Park v. California, 202 F.3d 1146, 1150 (9th Cir. 2000).

The Ninth Circuit Court of Appeals has determined that the "contemporaneous objection rule" is applied independently of federal law. See Vansickel v. White, 166 F.3d 953, 957 (9th Cir. 1999) (recognizing and applying California's contemporaneous objection rule in affirming denial of a federal petition on the ground of procedural default); Bonin v. Calderon, 59 F.3d 815, 842-843 (9th Cir. 1995) (sustaining state court's finding of procedural default where defendant failed to make any objection at trial). Respondent has adequately pled the existence of a procedural bar, and the burden now shifts to Petitioner. Bennett v. Mueller, 322 F.3d 573, 586 (9th Cir. 2003)

Petitioner argues that the "rule is not regularly and consistently applied by the California courts, and therefore does not constitute an independent state ground that precludes federal review." (Traverse, at 4.) To be deemed adequate, the state law ground for decision must be well-established and consistently applied. Poland v. Stewart, 169 F.3d 573, 577 (9th Cir. 1999) ("A state procedural rule constitutes an adequate bar to federal court review if it was 'firmly established and regularly followed' at the time it was applied by the state court.")(quoting Ford v. Georgia, 498 U.S. 411, 424, 111 S.Ct. 850 (1991)). Although a state court's exercise of judicial discretion will not necessarily render a rule inadequate, the discretion must entail "'the exercise of

1   judgment according to standards that, at least over time, can become known and understood

2   within reasonable operating limits.'" Id. at 377 (quoting Morales, 85 F.3d at 1392).

3          Petitioner argues that under "California law, the decision whether to address prosecutorial

4   misconduct that was not the subject of a specific objection is a matter of discretion, rather than a

5   rule." (Traverse, at 4.)  Petitioner cites People v. Hill, 17 Cal.4th 800 (1998) for support that this

6   Court should review the combined effect of prosecutorial misconduct for claims that were

7   objected to and not objected to because of the overall impact on the fairness of the trial.  (Id.)

8   However, the circumstances in Hill are distinguishable from the present case.  As stated by the

9   Court of Appeal in this instance, the failure to interject a timely and specific objection and/or

10  failure to request an admonition or curative instruction generally forfeits the claim from review on

11  appeal. (Lodged Doc. No. 1, Opinion, at 11.)  However, "[a] defendant will be excused from the

12  necessity of either a timely objection and/or a request for admonition if either would be futile" or

13  if "'an admonition would not have cured the harm caused by the misconduct.'"  Id.; see also

14  People v. Hill, 17 Cal.4th at 820 (citations omitted).  In Hill, the California Supreme Court found

15  that further objection by defendant's counsel would have been futile as the trial court had

16  repeatedly overruled, albeit erroneously, counsel's numerous objections.  Id. at 821-822.  In

17  contrast, the appellate court in this case found no reason to overlook the general rule that failure

18  to interject a timely objection and/or request a curative instruction finding "any misconduct was

19  not so pervasive, nor was the courtroom atmosphere so poisonous." (Lodged Doc. No. 1,

20  Opinion, at 33.)

21         Moreover, in Hill, there were significant other legal errors found meritorious including, the

22  trial's courts abuse of discretion when defendant was ordered shackled, the trial court's failure to

23  excuse the Bailiff after he testified against the defendant, and instructional error.  In conclusion,

24  the Hill Court stated:

25              The sheer number of the instances of prosecutorial misconduct, together
            with the other trial errors, is profoundly troubling.  Considered together, we
26          conclude they created a negative synergistic effect, rendering the degree of overall
            unfairness to defendant more than that flowing from the sum of the individual
27          errors.  Considering the cumulative impact of Morton's misconduct at both the
            guilt and penalty phases of the trial, together with the Carlos error and the other
28          errors throughout the trial, we conclude defendant was deprived of that which the

state was constitutionally required to provide and he was entitled to receive: a fair
trial.

People v. Hill, 17 Cal.4th at 847.

Petitioner has failed to demonstrate his burden of showing that the "contemporaneous
objection rule" is not consistently applied.  California Courts have consistently applied the
contemporaneous objection rule.  Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002) ("We
held more than twenty years ago that the rule is consistently applied when a party has failed to
make any objection to the admission of evidence.") (citing Garrison v. McCarthy, 653 F.2d 374,
377 (9th Cir. 1981); Vansickel v. White, 166 F.3d at 957-58; Bonin v. Calderon, 59 F.3d at 842-
43.  In this instance, Petitioner raises several independent claims of prosecutorial misconduct and
only some were objected to by defense counsel.  Thus, the claims that were not objected to are
procedurally defaulted from review.

Petitioner has made no attempt to demonstrate cause and prejudice or that a miscarriage
of justice will result should the Court not consider the claim.[10]  Accordingly, the Court is
procedurally barred from reviewing those claims. However, even if the Court were to find the
claims not procedurally defaulted, for the reasons explained herein and by the appellate court,
Petitioner's claims fail on the merits under § 2254(d).

///
///
///
///
///
///

_____

[10] In order to establish cause for a procedural default, a petitioner must "show that some objective factor
external to the defense impeded counsel's efforts to comply with the State's procedural rule." Coleman, 501 U.S.
at 753 (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986).  In addition to establish a fundamental miscarriage of
justice, a petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is
actually innocent." Murray. 477 U.S. at 496

4.    Analysis of Merits of Claim[11]

a.    Prosecutor's Questioning of C.S.'s Mother/Illegal Drug Use

Petitioner argues that "[t]he record reflects that the prosecutor clearly intended to elicit from C.S.'s mother that she bought methamphetamine <u>for</u> petitioner" in an attempt to explain why she did not call the police immediately after her daughter reported that Petitioner molested her. (Traverse, at 5.)  Contrary to Petitioner's contention, the record does not support his claim that there was prejudicial misconduct.[12]  When the prosecutor asked C.S.'s mother why she went to Stockton, she responded "[t]o get some crank for [petitioner]." (RT 546.)  The trial court immediately called a side-bar and admonished the jury that they were "to disregard the last comment" and "treat it as if it's never been said and you never heard it." (<u>Id.</u>)  Shortly thereafter, the trial court again ordered a side-bar and outside of the jury's presence, reminded C.S.'s mother "that there was not to be any mention of drug use, and that she was not to bring it up again." (RT 547.)  The trial and appellate court's findings that there is no showing that the prosecutor intentionally elicited the evidence of Petitioner's drug use, are not an unreasonable determination of the facts in light of the record.  Although the appellate court found the prosecutor should not have elicited, in front of the jury, the fact that C.S.'s mother had been told not to say certain things, the incident was brief and isolated and followed immediately by a curative admonition by the trial court.  Moreover, Petitioner was described as "mean," "vindictive," "vulgar," and "abusive." (RT 544, 555, 761-761.)  Thus, there was admissible evidence before the jury that

---

[11] On direct appeal, Petitioner raised numerous instances of prosecutorial misconduct; however, the instant petition argues only that the prosecutor committed misconduct by referring to evidence that the trial court ruled inadmissible in front of the jury, "engaged in prejudicial argument to the jury, and committed other misconduct during trial." As to the last claim of "other misconduct during trial," it is vague and lacking in factual support and does not warrant habeas corpus relief.  See Rule 2 of the Rules Governing Section 2254 Cases (a § 2254 petition must specify all ground for relief and all supporting facts as to each claim.)  Accordingly, this Court will only refer the two claims of prosecutorial misconduct specified with supporting facts in the petition and traverse.

Moreover, Petitioner fails to explain or elaborate on this claim in his traverse.  This vague and unsupported claim does not warrant review.  See Jones v. Gomez, 66 F.3d 199, 204 (9th Cir. 1995) (quoting James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994) ("'[c]onclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.'").

[12] Before trial, and over the prosecution's protest, the court granted the defense's motion in limine to exclude any reference to Petitioner's alleged illegal drug use.

Petitioner was not an upstanding person, and the minimal references to illegal drug use, viewed in the context of the overall proceedings, could not have prejudiced Petitioner.

Accordingly, the state court's decision was not contrary to or an unreasonable application of, clearly established Federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(1), (2).

b.   Closing Argument

Petitioner argues that the appellate court's finding that the prosecutor's closing argument to the jury was not prejudicial is unreasonable in light of the evidence. (Traverse, at 8.) Petitioner challenges the prosecutor's rebuttal to defense counsel's criticism of the initial investigation by Officer Brewer. The prosecutor argued,

> You recall Mr. Clancy [defense counsel] coming out and first saying there was an amateur investigation. The reason he said there was an amateur investigation because after Officer Nicholas Brewer made his initial investigation no detective ever showed up.
>
> Actually, what the record shows, Ladies and Gentlemen, is that on November 20th, '03, [Petitioner] consented to a search to Detective Gorman who was then leading the investigation. When Detective Gorman did that search Sergeant Gruden and Detective Makarian were with him. Also the evidence shows – or actually, what I'm saying happened now at this point to rebut his statement is, Detective Gorman interviewed a witness on November 20th. And the on [sic] March 7th, '03 Detective Gorman interviewed this defendant on tape and he played the tape for you.
>
> On March 11th, the [Petitioner] –
>
> MR. CLANCY: Your Honor, I don't believe they played his tape.
>
> [PROSECUTOR]: You played the tape.
>
> MR. CLANCY: Of my client?
>
> [PROSECUTOR]: Snippets.  You played Detective –
>
> Ladies and gentlemen, it is you – you are the judges of the evidence in what was received in this trial.
>
> [PROSECUTOR]: May we approach, Your Honor?
>
> (Off-the-record side-bar conference.)
>
> [PROSECUTOR]: Ladies and Gentlemen of the Jury, defense counsel represented to you a detective never became involved in this case.  In fact it was the DA or myself who took over this investigation and yet just a few minutes ago the defendant played a tape of Detective Gorman interviewing [R.R.] So when he says

1   there is no detective involved in this investigation there was an amateur
2   investigation it's simply not true.

3   (RT 1431-1432.)

4       Although the tape-recorded interview of Petitioner was not admitted into evidence or

5   played for the jury, there was no prejudice by the prosecutor's mis-statement.  The gist of the

6   prosecutor's reference to the tape recording was in response to defense counsel's argument that

7   there was an inadequate initial investigation because a detective was involved.  Petitioner reasons

8   that the prosecutor's statement informed the jurors that there was additional evidence that was

9   not being presented to them.

10      The trial court instructed the jury that it was to base its decision on the evidence alone,

11  and repeatedly told the jurors that the attorneys' statements were not evidence negating any

12  resulting prejudice.  This Court is required to presume that the jury followed the instructions

13  given unless there is admissible evidence to the contrary.  See Greer v. Miller, 438 U.S. 756, 766

14  n. 8 (1987); Weeks v. Angelone, 528 U.S. 225, 234 (2000); Richardson v. Marsh, 481 U.S. 200,

15  211 (1987); Francis v. Franklin, 471 U.S. 307, 324 n.9 (1985); Hovey v. Ayers, 458 F.3d 892,

16  913 (9th Cir. 2006).  Petitioner has not presented any evidence that the jury failed to follow the

17  instructions as given.  Rather, Petitioner submits that "[t]he jury would likely have inferred that

18  petitioner's statements were inadmissible due to some Miranda violation, which would explain to

19  the jury why the defense did not introduce it as evidence. Obviously, the jury would have

20  reasoned that if the statement had been exculpatory, defense counsel would have played it for

21  them, but did not.  The only remaining inference was that it was inculpatory but inadmissible for

22  some technical reason designed to let guilty people pull the wool over the eyes of the criminal

23  justice system."  (Traverse, at 10.)  There is no basis, beyond speculation, that the jury would

24  have made such an inference from the prosecutor's argument.  See Donnelly v. DeChristoforo,

25  416 U.S. 637, 647 (1974) ("[A] court should not lightly infer that a prosecutor intends an

26  ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy

27  exhortation, will draw that meaning from the plethora of less damaging interpretations.")  The

28  prosecution's initial reference to the tape-recorded interview of Petitioner was made in an attempt

to rebut defense counsel's argument that a detective was not involved, and while it arguably may not have been perfect, "[s]uch arguments, like all closing arguments of counsel, are seldom carefully constructed in toto before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear." Id. at 646-647. The trial court immediately instructed the jury that they were the judge of the evidence that was admitted, and following a side-bar thereafter, the prosecution quickly clarified that the admissible tape-recorded interview was of Rhonda Reeves. In light of the strength of the prosecution's case and instructions given to the jury, the prosecutor's comment did not render Petitioner's trial fundamentally unfair. This Court will not infer, as Petitioner would like, that the jury would have improperly considered this statement to mean that Petitioner must have made incriminating statements during the interview and it was only withheld due to some legal technicality. Given these circumstances, viewed in the context of the overall argument, it cannot be said that the prosecution's statement had a substantial and injurious influence on the jury's verdict.

D.    Imposition of Consecutive Terms/Violation of Sixth Amendment Right to Jury Trial

Petitioner contends that the trial court violated the Supreme Court's holding in Blakely v. Washington, 542 U.S. 296 (2004) and Cunningham v. California, 549 U.S. 270 (2007), by imposing an upper term and consecutive terms based on facts that were neither found by the jury nor admitted by Petitioner.

1.    Factual Background

In sentencing Petitioner to a total term of 107 years to life in prison, the court imposed: the upper term of 16 years on count 9 (§ 288.5); a consecutive one year term on count 7 (§ 288(b)(1)); plus six consecutive 15 years to life terms on counts 1 through 4 (§ 288(b)(1), 6 (§ 288(b)(1)) and 11 (§ 288(a)); and a concurrent 15 years to life term on count 10 (§ 288(a)). In imposing the upper term on count 9, the court determined:

> [Count 9] involved the continued sexual abuse of a child and the Court will impose the aggravated term. [¶] . . . [A]t the time the victim was particularly vulnerable because of her age and relationship [as] a stepchild. [Petitioner] took advantage of the situation. Molestations occurred when the mother was not present and he, therefore, showed a degree of sophistication in planning and committing the crimes. Therefore, this warrants the imposition of the aggravated term of 16 years as the principal term.

(RT 1509-1510.)  In regard to the imposition of consecutive terms, the court found:

> With respect to the indeterminate terms for Counts 1, 2, 3, 4, and 5, counsel is correct that the court has no discretion in this matter, not that it would reach a different result, but pursuant to Penal Code Section 667.6(d) each of the terms – [] a 15 to life term for count 1, a 15 to life term [for] count 2, a 15 to life term for count 3, a 15 to life term for count 4 and a 15 to life term for count [6] –. . . . each of the sentences are consecutive which results in a 75 to life with respect to those five counts.

> . . . The Court will impose an additional consecutive sentence for Count 11, which is an additional 15 to life term.  This was victim number 2 in the chronology of the trial and the acts committed upon children and these step-children and friends.  This victim was particularly vulnerable and clearly appellant took advantage of the position of trust with respect to the victim in Count 11. And, therefore, the Court will impose an additional consecutive 15 to life term.

> . . . The Court will make the determinate sentence or determinate terms consecutive to the indeterminate terms.  So with respect to the 17 year determinate term the Court finds that it should be consecutive because of the number of victims involved in this – involved in this pattern of conduct.  The manner in which the crimes were carried out indicate planning and sophistication and also using opportunity and positions of trust and power.

> The appellant induced the minors to participate in these acts particularly there was evidence as I recall having them put the movie into the VCR and to watch it to stimulate whatever conduct was sought.  And so with those matters in aggravation the Court will make the determinate sentence consecutive.

(RT 1510-1512.)  The trial court concurred in the District Attorney's request to make the factual

determination in aggravation:

> ... extreme cruelty, the intentional infliction of psychological harm on the child in addition to the molestation and also the attempts to isolate her from her parents and other family members.

(RT 1513.)

### 2. State Court Decision

On direct appeal, Petitioner argued that the imposition of the upper and consecutive terms

violated his right to a jury trial under Blakely v. Washington, 542 U.S. at 296, which was decided

during the pendency of his case.  In denying Petitioner's claim, the Court of Appeal held:

> Relying on *United States v. Booker*, 543 U.S. ___ [125 S.Ct. 738] (2005), *Blakely v. Washington*, 542 U.S. 296 (2004)), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), appellant contends the trial court violated his Sixth Amendment right to trial by jury and Fifth and Fourteenth Amendment right to due process of law by imposing upper and consecutive terms based on factors not admitted by appellant or found to be true by the jury beyond a reasonable doubt.  The California Supreme Court recently undertook an extensive analysis of these cases and concluded that the imposition of such sentences, as provided under California

law, is constitutional. *People v. Black*, 35 Cal.4th 1238, 1244, 1254, 1261-62. Accordingly, appellant's contention fails.

(Lodged Doc. No. 1, Opinion, at 43.)

      3.    <u>Applicable Law</u>

In <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 120 S.Ct. 2348 (2000), the Supreme Court overturned a sentencing scheme that allowed a state judge to enhance a defendant's penalty beyond the prescribed statutory maximum upon finding, by a preponderance of the evidence, that the defendant "acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation, or ethnicity." <u>Apprendi v. New Jersey</u>, 530 U.S. at 469. The Supreme Court reversed, holding that "any fact that increases the penalty for a crime *beyond the prescribed statutory maximum* must be submitted to jury, and proved beyond a reasonable doubt." <u>Id</u>. at 490. (Emphasis added.)

In <u>Blakely v. Washington</u>, 542 U.S. 296, 124 S.Ct. 2531 (2004), the Court explained that the "statutory maximum" for *Apprendi* purposes is the "maximum" sentence a judge may impose solely on the basis of facts reflected in the jury verdict or admitted by the defendant. In other words, the relevant "statutory maximum " is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional facts." <u>Id</u>. at 303-304.

In both <u>Apprendi</u> and <u>Blakely</u>, state law established an ordinary sentencing range for the crime the defendant was convicted of committing, but allowed the court to impose a sentence in excess of that range if it determined the existence of specified facts not intrinsic to the crime. In each case the Supreme Court held that a sentence in excess of the ordinary range was unconstitutional because it was based on facts that were not admitted by defendant or found true by the jury beyond a reasonable doubt.

In <u>United States v. Booker</u>, 543 U.S. 220, 125 S. Ct. 788 (2005), the Court applied its holding in <u>Blakely</u> to the Federal Sentencing Guidelines, finding the Guidelines unconstitutional. In reforming the Guidelines, the Court stated "If the Guidelines as currently written could be read as merely advisory provisions that recommended, rather than required, the selection of particular

sentences in response to differing sets of facts, their use would not implicate the Sixth

Amendment.  We have never doubted the authority of a judge to exercise broad discretion in

imposing a sentence within a statutory range." Id. at 233.  "For when a trial judge exercises his

discretion to select a specific sentence within a defined range, the defendant has no right to a jury

determination of the facts that the judge deems relevant."  Id.

        In People v. Black (Black I), 35 Cal. 4th 1238 (June 20, 2005), the California Supreme

Court held that California's Determinative Sentencing Law satisfied federal constitutional law as

follows: "*Blakely* and *Booker* established a constitutionally significant distinction between a

sentencing scheme that permits judges to engage in the type of judicial fact finding typically and

traditionally involved in the exercise of judicial discretion employed in selecting a sentence from

within the range prescribed for an offense, and a sentencing scheme that assigns to judges the type

of fact-finding role traditionally exercised by juries in determining the existence or nonexistence of

elements of an offense." People v. Black, 35 Cal.4th at 1253.  "[I]n operation and effect, the

provisions of the California determinate sentence law simply authorize a sentencing court to

engage in the type of fact-finding that traditionally has been incident to the judge's selection of an

appropriate sentence within a statutorily prescribed sentencing range." Id. at 1254.  The Court

held that the "presumptive" midterm does nothing more than establish a "reasonableness"

constraint on an otherwise wholly discretionary sentencing choice akin to that which the United

States Supreme Court has deemed constitutional.  Id. at 1261.

        Most recently, in Cunningham v. California, __ U.S. __, 127 S.Ct. 856 (2007), the

Supreme Court overruled the holding in Black, and held that the middle term in California's

determinate sentencing law was the relevant statutory maximum for the purpose of applying

Blakely and Apprendi.  Id. at 868.  Specifically, the Court held that imposing the upper sentence

violated the defendant's Sixth and Fourteenth Amendment right to a jury trial because it "assigns

to the trial judge, not the jury, authority to find facts that expose a defendant to an elevated

'upper term' sentence."  Id. at 860.

///

///

4. <u>Analysis of Claim</u>

The California Court of Appeal's decision holding that the imposition of consecutive terms based on findings not made by a jury, was not contrary to United States Supreme Court precedent. The United States Supreme Court has recently held that the right to trial by jury does not attach to the trial court's decision to impose consecutive sentences. <u>Oregon v. Ice</u>, __ U.S. __, 129 S.Ct. 711, 714-715 (2009).

However, Respondent concedes and this Court finds that the California Court of Appeal's decision relying on <u>Black I</u> in upholding the imposition of the upper term without a trial by jury was contrary to then-existing United States Supreme Court precedent. <u>See</u> <u>Butler v. Curry</u>, 528 F.3d 624, 640-641 (9th Cir. 2008). Nonetheless, such error does not entitle Petitioner to automatic relief unless it cannot be said that the error was harmless. <u>See</u> <u>Washington v. Recuenco</u>, 548 U.S. 212 (2006).

In <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 113 S.Ct. 1710 (1993), the U.S. Supreme Court substantially restricted state prisoners' access to federal habeas relief by requiring a showing that the violation of a federally guaranteed right had a "substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623, 113 S.Ct. 1710, 1714 (1993) (*quoting* <u>Kotteakos v. United States</u>, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253 (1946)). In order for an error to have a "substantial and injurious effect or influence," it must have "affected the verdict." <u>O'Neal v. McAnnich</u>, 513 U.S. 432, 115 S.Ct. 992, (1995). "Review for harmless error under *Brecht* is 'more forgiving' to state court errors than the harmless error standard the Supreme Court applies on its direct review of state court convictions." <u>Larson v. Palmateer</u>, 515 F.3d 1057, 1064 (9th Cir. 2008).

In <u>Butler</u>, the Ninth Circuit applied the <u>Brecht</u> standard to <u>Cunningham</u> error and stated that habeas corpus relief is appropriate only if the district court is "in 'grave doubt' as to whether a jury would have found the relevant aggravating factors beyond a reasonable doubt." <u>Butler v. Curry</u>, 528 F.3d at 684; <u>see also</u> <u>Bains v. Cambra</u>, 204 F.3d 964, 971 n.2 (9th Cir. 2000) (habeas relief is unwarranted unless "'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error'") (quoting <u>People v.</u>

1   <u>Watson</u>, 46 Cal.2d 818 (1956)).  Under California law, a single aggravating circumstance is

2   sufficient to authorize imposition of an upper term sentence, and any <u>Cunningham</u> error is

3   harmless if the federal court has grave doubt that the jury would have found at least one

4   aggravating circumstance true beyond a reasonable doubt.  <u>Butler</u>, 528 F.3d at 648 ("Any

5   *Apprendi* error therefore will be harmless if it is not prejudicial as to just one of the aggravating

6   factors at issue."); <u>People v. Sandoval</u>, 41 Cal.4th 825, 839 (2007) (if a jury finding would have

7   been made on "at least a single aggravating circumstance," then the *Cunningham* error is harmless

8   because "the jury's verdict would have authorized the upper term sentence").

9       Here, the imposition of the upper term on count 9 was harmless because the trial court

10  relied primarily on the fact that B.D. was particularly vulnerable which was based on uncontested

11  evidence.  In <u>Butler</u>, the Ninth Circuit recognized that under California law, particular

12  vulnerability is found where the victim had "inherent personal characteristics" that "render them

13  more vulnerable than other victims [of the same crime]." <u>Butler</u>, 528 F.3d at 649.  The evidence

14  was undisputed that B.D. was Petitioner's stepdaughter, and was between the ages of 8 and 15, at

15  the time of the sexual abuse.  It was also undisputed that Petitioner and B.D.'s mother went

16  through a custody dispute.  Thus, considering B.D.'s young age and her relationship to Petitioner

17  she was beyond reasonable doubt a particularly vulnerable victim of the crime of continuous

18  sexual abuse.  <u>See</u> e.g. <u>People v. Valdez</u>, 23 Cal.App.4th 46, 49 (1994), overruled on other

19  ground in <u>People v.  Johnson</u>, 28 Cal.4th 240, 244 (2002).  Therefore, any error under

20  <u>Cunningham</u> was harmless beyond a reasonable doubt, and habeas relief is not available.

21  E.      <u>Ineffective Assistance of Trial Counsel</u>

22      By way of state habeas corpus petitions, Petitioner raised several instances of ineffective

23  assistance of counsel.  The state superior court denied the claims in a reasoned decision.  (Lodged

24  Doc. No. 5.)  The California Court of Appeal and California Supreme Court summarily denied the

25  petitions.  (Lodged Doc. Nos. 7, 9.)

26      The law governing ineffective assistance of counsel claims is clearly established for the

27  purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  <u>Canales v. Roe</u>,

28  151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective

1  assistance of counsel, the court must consider two factors.  Strickland v. Washington, 466 U.S.

2  668, 687, 104 S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First,

3  the petitioner must show that counsel's performance was deficient, requiring a showing that

4  counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by

5  the Sixth Amendment. Strickland, 466 U.S. at 687.  The petitioner must show that counsel's

6  representation fell below an objective standard of reasonableness, and must identify counsel's

7  alleged acts or omissions that were not the result of reasonable professional judgment considering

8  the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir.

9  1995).  Judicial scrutiny of counsel's performance is highly deferential.  A court indulges a strong

10  presumption that counsel's conduct falls within the wide range of reasonable professional

11  assistance.  Strickland, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Sanders v. Ratelle, 21

12  F.3d 1446, 1456 (9th Cir.1994).

13        Second, the petitioner must show that counsel's errors were so egregious as to deprive

14  defendant of a fair trial, one whose result is reliable.  Strickland, 466 U.S. at 688.  The court must

15  also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's

16  ineffectiveness.  Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356,

17  1461 (9th Cir. 1994).  More precisely, petitioner must show that (1) his attorney's performance

18  was unreasonable under prevailing professional norms, and, unless prejudice is presumed, that (2)

19  there is a reasonable probability that, but for counsel's unprofessional errors, the result would

20  have been different.

21        A court need not determine whether counsel's performance was deficient before examining

22  the prejudice suffered by the petitioner as a result of the alleged deficiencies.  Strickland, 466 U.S.

23  668, 697, 104 S.Ct. 2052, 2074 (1984).  Since it is necessary to prove prejudice, any deficiency

24  that does not result in prejudice must necessarily fail.  "A reasonable probability is a probability

25  sufficient to undermine confidence in the outcome."  Id. at 694.

26        Ineffective assistance of counsel claims are analyzed under the "unreasonable application"

27  prong of Williams v. Taylor, 529 U.S. 362 (2000).  Weighall v. Middle, 215 F.3d 1058, 1062

28  (2000).

26

1.      Failure to Investigate and Present Evidence of Alleged False Statements Made by
        Saker in Child Custody Proceeding With Her Ex-Husband Haaland

Petitioner contends that trial counsel did not investigate and present evidence that his ex-wife, Sheri Lamb [Saker], made false statements and engaged in mendacious conduct to gain an advantage in the child custody proceedings with her ex-husband Richard Haaland.  (Lodged Doc. No. 8.)  Petitioner's argument is based on the assumption that presentation of the alleged manipulation in the child custody proceedings with her ex-husband would have impeached Saker's credibility by disclosing the fact that she had a financial motive to obtain custody over M.L. and H.L.  In this regard, Petitioner argues:

> [A]s of November 2002, [Saker] was back in Merced with a different
> boyfriend, Jerry Zarate, with whom Petitioner had a conflict.  Petitioner's belief
> was that [Saker] was concerned that Jerry Zarate would leave her destitute and
> without a place to live because Petitioner insisted that Zarate not stay at [Saker's]
> residence, which Zarate was in part paying for, because of Zarate's mistreatment
> of children. [Saker] therefore needed custody to protect her precarious financial
> situation.

(Lodged Doc. No. 8, at 6.)  Petitioner's claim is completely unfounded.  The only support Petitioner submits is the clerk's minutes in the divorce proceeding between Saker and Haaland; however, nothing in such minutes reveals any false statement or mendacious conduct on the part of Saker.  Accordingly, there is simply no support, beyond Petitioner's self-serving assertion, that Saker was manipulating the child custody proceedings with Haaland.  Thus, Petitioner failed to meet the "initial burden of showing the existence of admissible evidence which could have been uncovered by reasonable investigation and which would have proved helpful to the defendant either on cross-examination or in his case-in-chief at the original trial."  McQueen v. Swenson, 498 F.2d 207, 220 (8th Cir. 1974).

In any event, Petitioner has not established a reasonable probability of prejudice, beyond mere speculation.  Strickland, 466 U.S. at 697.  There is simply no showing that even if Petitioner did or can discover evidence of Saker's false accusations in a prior custody dispute with a former husband, there is a reasonable probability that the outcome would have been different.  The trial court hinted that it would preclude such testimony relating to previous relationship and divorce and custody disputes involving Petitioner or other people.  (RT 773, 883-885.)  The alleged

27

incident between Haaland and Saker occurred almost twenty years prior to the prosecution in this case. Thus, it is highly likely such evidence, even if discovered, would have been rendered too remote in time and irrelevant to the instant proceedings. Accordingly, Petitioner's claim fails under Strickland.

For this same reason, Petitioner fails to demonstrate good cause for the necessity of further development of this claim through the discovery process. Although discovery is available pursuant to Rule 6, it is only granted at the Court's discretion, and upon a showing of good cause. Bracy v. Gramley, 520 U.S. 899, 904 (1997); McDaniel v. United States Dist. Court (Jones), 127 F.3d 886, 888 (9th Cir. 1997); Jones v. Wood, 114 F.3d 1002, 1009 (9th Cir. 1997); Rule 6(a) of the Rules Governing Section 2254. Good cause is shown "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." Bracy v. Gramley, 520 U.S. at 908-09 (citing Harris v. Nelson, 394 U.S. 287 (1969). Discovery will not be allowed so that the petition can "explore [his] case in search of its existence," looking for new constitutional claims. See Rich v. Calderon, 187 F.3d 1064, 1067 (9th Cir. 1999). If good cause is shown, the extent and scope of discovery is within the court's discretion. See Habeas Rule 6(a). The Court's duty in a habeas proceeding is to determine whether or not petitioner's constitutional rights were violated in the course of the conviction.

2.   Failure to Introduce Evidence that Thomas Flores Falsely Accused Petitioner of Being a Child Molester

Petitioner contends that trial counsel was incompetent by failing to introduce testimony that Thomas Flores had "falsely accused" him of being a child molester, despite mention of such fact during opening statement. Petitioner argues this false accusation had "tarnish[ed] his reputation in the community and ma[de] him a future target for similar allegations." (Lodged Doc. No. 8, at 8.)

During opening statement, defense counsel argued:

The next event that occurs is there is an individual named Tommy Flores, basically what happened here is none of his business, but he decided he was going to tell everyone he knew that [Petitioner] was a child molester and proceeded to do so

28

and we know this because we have his ex-wife coming to testify.  He even went on school grounds he went up to the Lamb children calling their father a sex molester.

(RT 189.)

Trial counsel did not present evidence of Flores' alleged accusations to the jury.  Defense counsel did call Sheri Flores, Tommy Flores' ex-wife, to testify but she was not asked about the allegations of molestation made by her ex-husband.  The Court finds that Petitioner has failed to demonstrate that but for counsel's representation during his opening statement, the result of the trial would have been different.  There was a plausible reason why counsel decided not ton introduce the evidence of Flores' 1998 accusation.  The fact that Petitioner had previously been accused of molestation and this somehow tainted his representation to his girls and ex-wife is tenuous.  Even if it may have been beneficial to challenge the allegations by his children, it is also reasonable to infer that counsel's failure to present such evidence was a tactical decision after listening to the prosecution's evidence and concluding that it would have been more harmful than helpful.  Strickland, 466 U.S. at 690; Bashor v. Risley, 730 F.2d at 1241.  In addition, the jury was instructed that it must base its decision solely on the facts and the law, and if anything said during the trial by attorneys in their arguments conflicts you must follow the instructions of law given by the judge.  Statements by counsel are not evidence and cannot be considered as such by the jury.  (CT 753-754.)  "The Court presumes that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them."  Francis v. Franklin, 471 U.S. 307, 324 n.9 (1985).  Based on the foregoing, the state courts' determination of this issue was not contrary to, or an unreasonable application of Strickland.

> 3.   Failure to Adequately Investigate and Present Good Character Evidence to Demonstrate Petitioner's Innocence and Rebut Prosecution's Argument

Petitioner contends that trial counsel did not adequately investigate and present good character evidence.  In support of his claim, Petitioner attached the declaration of Douglas Glynn, along with a written statement by Mr. Glynn to the Probation Department.  (Lodged Doc. No. 8, Exhibits 8 & 21.)  Glynn stated that he was "well acquainted" with Petitioner, through

Petitioner's sister, whom he had a "relationship" with.  Glynn stated that he saw Petitioner and his girls on "a number of family setting, including holidays and an annual two week vacation."  Glynn would testify that based on his knowledge and observations, Petitioner was a good father.  As additional support for this claim, Petitioner attaches his correspondence with school and medical administrators, who he claims could have testified to his involvement as a parent.  (Lodged Doc. No. 8, Exhibit 12.)

Even if it is assumed that counsel rendered ineffective assistance for failing to present these character witnesses, Petitioner has not shown prejudice as a demonstrable reality.  Strickland, 466 U.S. at 697.[13]  It is not unreasonable to conclude that presenting numerous character witnesses would benefit Petitioner's defense, given that both Douglas Glynn and the school/medical administrators had no first-hand knowledge relevant to Petitioner's defense that the allegations were false.  First, the value of Glynn's testimony would have been very minimal because he and Petitioner's sister lived a substantial distance from Petitioner, and only saw them on occasion.  Second, the value of Glynn's testimony was certainly subject to impeachment given that he resided and had a relationship with Petitioner's sister.  (Lodged Doc. Nos. 8 [Exhibit 8] and 15 [RT 1206, 1208].)  Moreover, the school and medical administrators, with whom Petitioner corresponded, did not have any intimate knowledge of Petitioner and his relationship with his daughters-whether he was abusing and molesting them.  Petitioner's involvement in his children's education was irrelevant to the charges in the instant case and was not even disputed.  (See e.g. Lodged Doc. No. 15 [RT 1133-34 (mention of Petitioner hiring a tutor for his girls)].)  The District Attorney reiterated this point during argument stating:

> . . . [L]ike many people who abuse children, as to Petitioner he's got a secret life.  You don't go to the 7-Eleven, park and molest your kids, it's done in private.

(RT 1361 .)

Furthermore, even with the testimony of these two witnesses, the evidence against

---

[13] It appears Petitioner faults Respondent by conceding potential misconduct and arguing there was no resulting prejudice.  However, such analysis was specifically approved in Strickland, 466 U.S. at 697.

Petitioner was compelling.  The trial evidence included testimony that Petitioner played pornographic videos for his daughters and their friends; he referred to his daughters in derogatory terms such as "bitch" and "whore"; and he was physically abusive to his daughters and their mother.  (RT 448-450, 453-444, 518, 631-633.)  Petitioner also wrote letters to Trisha Carpool, requesting that she "buy off" prosecution witnesses or find out "things" about those witnesses to discredit or "ruin" them.  (RT 689, 933-934.)  Petitioner was also described by two separate witnesses as "mean," "vindictive," "vulgar," and "abusive."  (RT 544, 555, 761-761.)  In addition, the presentation of good character evidence would have opened the door to presentation by the prosecution of further bad character evidence.  Petitioner has failed to overcome the strong presumption that the challenged action, counsel's failure to object, might have been sound trial strategy under the circumstances.  See Strickland, 466 U.S. at 690 (a reasonable tactical decision by counsel with which the defendant disagrees cannot form a basis for an ineffective assistance of counsel claim).  In evaluating counsel's conduct, the Court must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Id. at 689.  In light of these circumstances, it is not reasonably probable that a verdict more favorable to the Petitioner would have resulted had Petitioner's trial counsel called Glynn and the school and medical administrators to testify as to his good character.

       4.    <u>Failure to Elicit From Dr. Schuller that Petitioner had Herpes</u>

       Petitioner contends that trial counsel failed to investigate and present the medical evidence from Dr. George Schuller that Petitioner had herpes to foreclose the District Attorney's argument that he lied about having contracted herpes from Janet Deal, but was instead exploiting the information from Janet Deal in an attempt to control her.  (RT 1357-1359.)

       Petitioner argues that the District Attorney's attempt to present this evidence shattered his credibility to the jury resulting in prejudice.  Petitioner's credibility was openly challenged at trial, and whether he, in fact, had herpes would impeach only his testimony on an issue collateral to his guilt.  Indeed, his credibility was challenged on several other issues (see e.g. RT 1310-1377), and impeachment on that collateral issue was unlikely to affect the jury's evaluation of his testimony.

Moreover, the prosecution's argument that Petitioner gained control over vulnerable women through fear, was not dependent on whether Petitioner had in fact contracted herpes from Deal and was supported by other evidence.  Janet Deal testified that before having sexual relations with Petitioner, she informed him she had herpes.  Petitioner was not concerned until Deal sought to end the relationship with him.  (RT 890-891.)  Thus, even without the reference to Petitioner lying about contracting herpes, the prosecution's theory remained unchanged.  Accordingly, Petitioner's claims fails under <u>Strickland</u>.

5. <u>Failure to Investigate and Present Evidence of Alleged Additional False Allegations of Child Molestation by Brad Deal</u>

Petitioner contends that trial counsel failed to investigate and present evidence of additional false allegations of child molestation by Brad Deal, Janet Deal's husband, showing "false charges [were] being made against [him] by adults motivated by personal anger and bias."  As with Petitioner's previous claim regarding Thomas Flores's accusations of child molestation against Petitioner, even if it is assumed counsel was incompetent for failing to present this evidence, Petitioner has not and can not demonstrate prejudice.

The fact that Deal had previously falsely accused Petitioner of molestation had little probative value toward the molestation charges in this case, and introduction of such evidence would very likely serve to confuse and mislead the jury.  The charges in this case did not involve Deal or Deal's daughter, and it is highly likely the trial court would have excluded such evidence under California Evidence Code section 352.

In addition, there is a very plausible reason why counsel would not seek to introduce another accusation of child molestation against Petitioner.  The jury was already presented with several accusations of child molestation, and yet another incident would most likely not have benefitted Petitioner.  There is not a reasonable probability that the verdict would have been more favorable to Petitioner had counsel presented evidence of Deal's accusation and argued he was motivated by his own personal bias against Petitioner.  Accordingly, the state court reasonably rejected this claim.

///

6.      Failure to Impeach Dr. Urquiza

Petitioner contends that trial counsel was ineffective for failing to impeach Dr. Urquiza.

Petitioner cites the following colloquy as support for his claim:

[DISTRICT ATTORNEY]: This maxim, it has become a maxim on child sexual abuse, interviews, counselors and investigators that children never fabricate, do you believe children never fabricate false allegations of child sexual abuse?

[DR. URQUIZA]: Sometimes, although in my opinion – [it is very rare]

[DEFENSE COUNSEL]: I move to strike.

THE COURT: It will be stricken . . .

[DISTRICT ATTORNEY]: What about the first part?

THE COURT: Ladies and Gentlemen, disregard the first part.

[DEFENSE COUNSEL]: May we approach?

THE COURT: No, we'll take it up later.

[DISTRICT ATTORNEY]: Do children sometimes make false allegations?

[DR. URQUIZA]: Sometimes, yes.

Q. . . . In the scientific community is there a maxim that children never make false allegations?

A. I'm not aware of that.

(RT 1043.)  Outside of the presence of the jury, defense counsel moved for a mistrial on the basis of Dr. Urquiza's testimony that in his opinion it was very rare for children to make false accusations of molest.[14]  Defense counsel objected to the testimony and the trial court immediately ordered the entire portion of the statement stricken and disregarded.  (RT 1043.)

Petitioner argues defense counsel should have impeached Dr. Urquiza's testimony with professional literature demonstrating that false accusations most frequently occur in disputed child custody battles.  In support of this claim, Petitioner cited to several law review articles which discussed studies finding a higher incident of false accusations in divorce/custody proceedings.

---

[14] It appears from the record that the court reporter did not hear or transcribe the objectionable portion of Dr. Urquiza's testimony stating "it is very rare"; however, the Court finds such testimony was actually presented. (See RT 1045-1046.)

See e.g. Jean Montoya, *On Truth and Shielding in Child Abuse Trials*, 43 Hastings L.J. 1259, 1315, n.270 (1992); Robert Marks, *Should We Believe the People Who Believe the Children?*: *The Need for a New Sexual Abuse Tender Years Hearsay Exception Statute*, 32 Harv. J. on Legis. 207, 209 (1995); Stephen Ceci and Richard Friedman, *The Suggestibility of Children: Scientific Research and Legal Implications*, 86 Cornell Law Rev. 33, 84, n.233 (2000); *see also* Amy Haddix, *Unseen Victims; Acknowledging the Impact of Domestic Violence on Children Through Statutory Termination of Parental Rights*, 84 Calif. L. Rev. 757, 803 (1996).

As does Petitioner, this Court operates under the belief that the jury could have heard Dr. Urquiza's testimony, despite the lack of transcription, given that the trial court ordered it stricken and the parties discussed its content in detail.  In any event, the record is clear that Petitioner can not demonstrate any prejudice from counsel's failure to impeach Dr. Urquiza with literature suggesting the statical rate of false accusations among children because such questioning would have been improper.

The trial court made clear that the introduction of evidence of statistical percentage of false accusations would be an improper comment on the credibility of the molestation victims. (RT 1038-1040.)  Thus, any impeachment by counsel would have likely been objected to and stricken from the record.  Accordingly, Petitioner can not demonstrate any prejudice.  While it is true that Dr. Urquiza should have not offered his opinion that false accusations rarely occur, the trial court properly sustained the objection and ordered the statement stricken and disregarded. Petitioner makes no allegation that the jurors were not able to follow the court's instruction and disregard Dr. Urquiza's statement.  Greer v. Miller, 483 U.S. at 767.  Furthermore, Dr. Urquiza subsequently acknowledged that children "sometimes" make false allegations of sexual abuse. (RT 1032, 1043-1044.)  In addition, during cross-examination, the following colloquy took place:

> [DEFENSE COUNSEL]: A parent can pressure, suggest, tell a kid to falsely accuse in order to gain custody of a child, isn't that true?
>
> [DR. URQUIZA]: There is some literature on children who have made allegations that are not true or that are false allegations.

(RT 1032.)  Petitioner submits that on March 21, 2005-subsequent to the trial in this case-Dr. Urquiza testified in the case of People v. Michael Jackson, in Santa Barbara County.  Dr. Urquiza

34

testified that the professional literature demonstrated that false accusations occurred primarily in the context of "bitter parental custody battles." Exhibit 17. This testimony was offered to rebut the defense claim that the complaining witness had falsified the molestation out of financial gain. Petitioner reasons that the "same testimony would have substantially strengthened the foundation of the defense in this case that Sheri had put Melody and Harmony up [to] making false allegations in order for Sheri to obtain custody and to maintain her living situation with Jerry Zarate." (Traverse, at 39.) However, contrary to Petitioner's claim, there does not appear to be any evidence that there was a pending child custody dispute at the time that H.L. and M.L. made their allegations. It was Petitioner's theory and defense that M.L., H.L., and B.D. were presenting the false accusations in an attempt to further their mother's plan to gain custody of H.L. and M.L. In any event, R.R. and C.S. were not Petitioner's children and such reasoning would clearly not apply to them. Based upon these circumstances, it is not reasonably probable that a verdict more favorable to the Petitioner would have resulted had Petitioner's trial counsel been allowed to impeach Dr. Urquiza with the professional literature cited by Petitioner. Accordingly, Petitioner's claim fails on the merits.

       7.     <u>Failure to Elicit From Janet Deal and Sheri Flores that Petitioner had Frequent Episodes of Unconsciousness</u>

Petitioner further contends that trial counsel should have questioned Janet Deal and Sheri Flores to elicit testimony, in support of his defense, that he had frequent episodes of unconsciousness while he was involved in relationships with them.

First, Petitioner fails to present a declaration by Janet Deal and Sherry Flores that would substantiate their purported testimony. In presenting a claim of ineffective assistance based on counsel's failure to call witnesses, Petitioner must identify the witness, <u>U.S. v. Murray</u>, 751 F.2d 1528, 1535 (9th Cir. 1985), show that the witness was willing to testify, <u>U.S. v. Harden</u>, 846 F.2d 1229, 1231-32 (9th Cir. 1988), and show that the witness's testimony would have been sufficient to create a reasonable doubt as to guilt. <u>Tinsley v. Borg</u>, 895 F.2d 520, 532 (9th Cir. 1990); <u>see also United States v. Berry</u>, 814 F.2d 1406, 1409 (9th Cir. 1989) (holding that where defendant did not indicate what witness would have testified to and how such testimony would have

changed the outcome of the trial, there can be no ineffective assistance of counsel).  The absence

of affidavits from uncalled witnesses puts a petitioner's claim at a disadvantage.  Howard v.

O'Sullivan, 185 F.3d 721, 724 (7th Cir. 1999) ("failure to submit supporting affidavits from [the]

potential witnesses would severely hobble [the petitioner's] case.")  Thus, Petitioner's claim that

these witnesses could have provided such testimony is merely speculation and without evidentiary

support.  Although Petitioner submits his verified petition and declaration declaring that the

alleged incidents occurred, this evidence was presented, and obviously rejected, by the jury in this

case.  In fact, Petitioner's own testimony indicated only that he had memory lapses, however,

such testimony was insufficient to demonstrate a diagnostically link to a dissociative state rather

than a simple lack of recollection.  Accordingly, Petitioner failed to meet the "initial burden of

showing the existence of admissible evidence which could have been uncovered by reasonable

investigation and which would have proved helpful to the defendant either on cross-examination

or in his case-in-chief at the original trial."  McQueen v. Swenson, 498 F.2d at 220.  The state

courts' determination of this issue was not contrary to, or an unreasonable application of, clearly

established Supreme Court precedent.

　　　　8.　　Failure to Investigate And Rebut Alleged False Testimony by Saker

　　　　Petitioner next contends that counsel failed to adequately investigate and rebut specific

instances of false testimony by Saker.  More specifically, Petitioner contends that counsel should

have investigated and rebutted Saker's testimony that "Petitioner forced her to work after she had

surgery, beat her, and otherwise mistreated her," only to gain child custody for her own financial

interest.

　　　　Even assuming counsel was somehow ineffective for failing to rebut Saker's alleged false

testimony, there is no showing of any resulting prejudice.  Petitioner testified at trial and denied

that he ever beat Saker, and portrayed her as an uncaring and negligent parent.  (RT 1213-1216,

1234.)  In addition, contrary to Petitioner's claim, Saker's testimony was not that she was

employed at the time of her surgery, but rather that Petitioner forced her to take care of the

children-which caused further injury.  (RT 639-640.)  Saker acknowledged on direct examination

that she was not employed at the time she was married to Petitioner.  (RT 627-628.)  Petitioner

36

merely seeks to relitigate his defense. Petitioner presents no further support for his claim and there is no showing of prejudice as a demonstrable reality, beyond mere speculation. Accordingly, the state habeas court reasonably rejected this claim.

         9.     Failure to Impeach Rhonda Reeves With Prior False Molestation Allegation Against Her Father

Petitioner contends that trial counsel should have impeached Rhonda Reeves with her prior false molestation allegations against her father, Joe Reeves. Trial counsel sought to introduce evidence under California Evidence Code section 782 that Rhonda Reeves was not sexually naive. Counsel argued that Debbie McLead, Rhonda Reeves's mother, told him that she was molested by an individual while visiting her father. (CT 267-268.) The court held a hearing, and McLead denied telling a former friend that Rhonda Reeves said she was sexually touched by someone while at her father's house. (RT 83-84.) The trial court denied the motion. A short time later, defense counsel was informed by Joe Reeves, Rhonda Reeves's father, that he had been contacted by a city of Chowchilla police officer who told him that Rhonda's mother contacted the police to report that he molested his daughter. (Lodged Doc. Nos. 8 [Exhibit 15] and 19 [CT 633].) Petitioner's trial counsel then requested discovery of the police and hospital reports relating to the accusations of molesting Rhonda Reeves against Joe Reeves. (Lodged Doc. Nos. 8 [Exhibit 18] and 19 [CT 583-584]) and renewed his section 782 motion to introduce this evidence. (CT 587-591). The Chowchilla Police Department was unable to locate any reports relating to the accusations of molestation against Joe Reeves. (RT 171.) Without such evidence, defense counsel abandoned this motion. Id.

In his traverse, Petitioner contends that "the record does contain a handwritten declaration by Joe Reeves, dated November 12, 2003 and signed under penalty of perjury, in which he stated that he was informed of a molestation investigation emanating from the Atwater Police Department, that he denied any wrongdoing, and that he took Rhonda to a hospital for a sexual assault examination the following day, which turned out negative. 3 CT 633; Exhibit 15." (Traverse, at 51.) Petitioner argues this information was sufficient for admissibility under California Evidence Code section 782. Petitioner states that this report was obtained by an

37

1   investigator at 8:55 p.m. on November 12, and counsel could have sought to re-open the issues

2   the following day.

3          Even considering such evidence, Joe Reeves did not state that Rhonda reported he

4   molested her.  Mr. Reeves's only declared that a police officer informed him that McLead,

5   Rhonda's mother, reported that he had molested his daughter.  Therefore, there is no showing

6   that anyone, other than McLead, could have testified that Rhonda Reeves herself had accused her

7   father of molesting her, and McLead had already testified that she never said that Rhonda

8   Reeves's had been inappropriately touched by her father.  (RT 83-84.)

9          10.   Failure to Investigate and Present Evidence That Beth Dobbs' Allegations Were
               False
10

11          Petitioner contends that trial counsel did not adequately investigate and present evidence

12   that Beth Dobbs's accusations of child molestation could not have occurred because of a lack of

13   contact between her and Petitioner for many of the years involved.  Petitioner claims that because

14   Beth Dobbs left California in 1992, he could not have committed a large portion of the alleged

15   molestations.

16          Petitioner cites to the clerk's minutes in the divorce proceedings between Saker and

17   Haaland and to his own declarations.  (Lodged Doc. No. 8 [Exhibits 3 and 16].)  The clerk's

18   minutes in the Saker/Haaland divorce proceeding do not shed any light on whether Beth Dobbs

19   left California to live with her father in 1992.  The minutes are dated in 1983 and have no

20   information other than the resolution of the marriage.  In addition, at trial, Beth Dobbs said that

21   she lived with Petitioner until she left California when she was approximately 15 years of age.

22   (RT 580-581.)  Saker testified that she and Petitioner divorced in 1994, and shortly thereafter she

23   moved to Kansas.  Petitioner now argues that it should have been clear to his trial counsel that

24   Beth Dobbs left California in 1992 and a "bulk" of the allegations could not have occurred as she

25   alleged.  However, at trial, Petitioner never said that Beth Dobbs left California in 1992, despite

26   his apparent personal knowledge.  Petitioner's only memory was that B.D. and her siblings moved

27   from his house to live with their father in 1988 or 1989.  (RT 1232.)  This was clearly not correct

28   and Petitioner had no further knowledge.  Petitioner can not use the benefit of hindsight to argue

1  that counsel was ineffective for failing to elicit information that Petitioner had no knowledge of at

2  the time of trial.  Accordingly, Petitioner's claim is lacking in evidentiary support and habeas

3  corpus relief is foreclosed because there is no showing that counsel was incompetent or that

4  Petitioner was prejudiced.

5          11.    Denial of Due Process Right to Fair Trial Because of Incompetency

6          Petitioner contends that he was incompetent to stand trial.  In support of his claim,

7  Petitioner contended that he was "prescribed heavy medication[s] for anxiety and depression that

8  severely interfered with [his] mental functioning from December 2002 through the time of trial.

9  Petitioner also submitted a declaration by his sister, Lezlie Lovett, who visited him at the county

10 jail shortly before she testified, and found him to be "fragmented and unable to recall, discuss or

11 keep track of our conversation, and being angry and ranting about the situation."

12         Petitioner raised this claim for the first time in his state habeas corpus petition.  The

13 Superior Court, Court of Appeal, and California Supreme Court summarily rejected the claim.

14 (Lodged Doc. Nos. 5, 7, 9.)

15         "[T]he conviction of an accused person while he is legally incompetent violates due

16 process, and [] state procedures must be adequate to protect this right."  Pate v. Robinson, 383

17 U.S. 375, 376 (1966); see Drope v. Missouri, 420 U.S. 162, 171-172 (1975) ("Competence to

18 stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a

19 fair trial, including the right to effective assistance of counsel, the rights to summon, to confront,

20 and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent

21 without penalty for doing so.").  The standard for determining competence is whether the accused

22 "has sufficient present ability to consult with his lawyer with a reasonable degree of rational

23 understanding and whether he has a rational as well as factual understanding of the proceedings

24 against him."  Dusky v. United States, 362 U.S. 402, 402 (1960); see Cal. Penal Code § 1368 et

25 seq.  It is presumed that a defendant is competent and he bears the burden of demonstrating

26 otherwise.  See Medina v. California, 505 U.S. 437 (1992).

27         The only evidence Petitioner cites is the declaration by his sister regarding his mental state.

28 However, the record of the trial proceedings belie his claim of incompetency.  Petitioner did not

39

1  exhibit any irrational or erratic behavior in the courtroom or while he testified during trial.  See

2  Drope, 420 U.S. at 180 (factors to consider in determining a defendant's competency include

3  irrational behavior, demeanor at trial, and any prior medical opinion on competence.)  Nor did

4  Petitioner's trial counsel or the court express any concern or question regarding Petitioner's

5  ability to understand the nature of the proceeding, communicate with counsel, and assist in his

6  defense.  Therefore, because there is no evidence that would have caused a reasonable court to

7  doubt Petitioner's competence, the state court's rejection was not contrary to, nor an

8  unreasonable application of, Supreme Court precedent.

9  F.    Evidentiary Hearing

10        Petitioner requests an evidentiary hearing to resolve several of the issues.  However,

11  because all of Petitioner's claims can be resolved on the existing record, an evidentiary hearing is

12  not necessary.  Schriro v. Landrigan, 127 S.Ct. 1933, 1940, 167 L.Ed.2d 836 (2007) (evidentiary

13  hearing unwarranted where "the record refutes the applicant's factual allegations or otherwise

14  precludes relief"); Totten v. Merkle, 137 F.3d 1172, 1176 (9th Cir.1998) (if the claims can be

15  resolved by reference to the existing state court record, an evidentiary hearing will be regarded as

16  futile and will therefore be denied); Villafuerte v. Stewart, 111 F.3d 616, 633 (9th Cir.1997) (a

17  petitioner's request to have a federal court hear the same evidence heard by the state court in the

18  state habeas proceeding is not a valid reason for an evidentiary hearing.); Campbell v. Wood, 18

19  F.3d 662, 679 (9th Cir.1994) (an evidentiary hearing is not required on issues that can be resolved

20  by reference to the state court record).

21                                   RECOMMENDATION

22        Based on the foregoing, it is HEREBY RECOMMENDED that:

23        1.     The instant petition for writ of habeas corpus be denied; and,

24        2.     The Clerk of Court be directed to enter judgment in favor of Respondent.

25        This Findings and Recommendation is submitted to the assigned United States District

26  Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of

27  the Local Rules of Practice for the United States District Court, Eastern District of California.

28  Within thirty (30) days after being served with a copy, any party may file written objections with

the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

**Dated:    November 4, 2009**              _____ **/s/ Dennis L. Beck**_____
                                    UNITED STATES MAGISTRATE JUDGE